# DE LA VERGNE REFRIGERATING MACHINE COMPANY *v.* GERMAN SAVINGS INSTITUTION.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 45. Argued April 7, 11, 1899. — Decided November 30, 1899.

Under the laws of the State of New York, providing for the organization of manufacturing corporations, such corporations are not authorized to purchase the stock of a rival corporation, for the purpose of suppressing competition and obtaining the management of such rival.

Unless express permission be given to do so, it is not within the general powers of a corporation to purchase stock of other corporations for the purpose of controlling their management.

Where an action is brought upon a contract by a corporation to purchase such stock for such purpose, it is a good defence that the corporation was prohibited by statute from entering into it; even though the corporation may be compelled, in an action on *quantum meruit*, to respond for the benefit actually received.

THIS was a consolidation of eight actions brought by the German Savings Institution and seven other plaintiffs, in the Circuit Court of the city of St. Louis, against the De la Vergne Refrigerating Company and John C. De la Vergne, its president and principal stockholder, personally, for a failure to deliver to plaintiffs certain stock in the Refrigerating Company.

Certain personal property was seized upon attachment issued, a forthcoming bond given therefor, and the several actions were afterwards removed to the Circuit Court for the Eastern District of Missouri upon the joint petition of the defendants. In that court the several actions were consolidated and sub-

mitted upon an agreed statement of facts upon which judgment was entered for the defendants.

Pending the proceedings in the state court, and on May 12, 1896, John C. De la Vergne died, and on November 5, 1896, his death was suggested to the court, when William C. Richardson, public administrator of the city of St. Louis, entered his appearance, and with his consent an order was entered reviving each of such actions against him.

From the judgment so entered in the Circuit Court, a writ of error was taken from the Circuit Court of Appeals, the judgment of the court below reversed, and the cause remanded with directions to grant a new trial. 36 U. S. App. 184.

Amended answers were filed in the lower court, much testimony taken, the cause submitted to the court without a jury, and a judgment entered in favor of the plaintiffs for $126,849.96.

From this judgment a writ of error was prosecuted by the Refrigerating Company, one of the defendants. The judgment was affirmed by the Court of Appeals by an equal division. 49 U. S. App. 777. Whereupon the Refrigerating Company applied for and was allowed a writ of certiorari from this court.

*Mr. Frederick W. Lehmann* and *Mr. Charles H. Aldrich* for plaintiff in error, petitioner. *Mr. Charles Nagel* was on their brief.

*Mr. J. M. Wilson* and *Mr. Leo Rassieur* for defendants in error. *Mr. Eleneious Smith* was on their brief.

I. The contract involved in this cause was not *ultra vires* the De la Vergne Company.

(*a*) The subject-matter of the contract, the thing bargained for and purchased, was not stock of the Consolidated Company, but its tangible assets, its outstanding accounts and its good will, subject to the payments of its debts, and the custody thereof until such payment, by the Illinois assignee. *German Savings Institution* v. *De la Vergne Refrigerating Machine Co.*, 36 U. S. App. 184; *S. C.*, 70 Fed. Rep. 146.

(*b*) But if stock of the Consolidated Company was the subject-matter of the purchase by the De la Vergne Company, the contract was not *ultra vires*, because the laws of the State of New York do not prohibit such purchase, as contended by the De la Vergne Company, but on the contrary permit it. Laws N. Y. 1853, c. 331, § 2. Act of June 4. Rev. Stat. N. Y. 1889, Vol. 3, p. 1961; Laws of 1866, c. 838, §§ 3 and 4; Rev. Stat. N. Y. 1889, Vol. 3, p. 1967.

II. The contract was not *ultra vires* as requiring or obligating the De la Vergne Company to increase its capital stock.

The contract itself recites that the De la Vergne Company was then considering the plan of increasing its stock, and by the contract it was left optional with said company either to make such increase and to pay plaintiffs with such increased issue, or to pay in money.

But even if the contract had required such increase and the De la Vergne Company had no power to contract therefor and for the payment in such form, it will nevertheless be compelled to make compensation in some other form; in money. *Hitchcock* v. *Galveston*, 96 U. S. 341; *Fort Worth City Co.* v. *Smith Bridge Co.*, 151 U. S. 294; *State Board of Agriculture* v. *Citizens' Street Railway*, 47 Indiana, 407; Morawetz on Corporations, § 86; *Missouri Pacific Railway* v. *Sidell*, 35 U. S. App. 152; *Bensiek* v. *Thomas*, 27 U. S. App. 765.

III. The contract was not *ultra vires* the Consolidated Company because it was not a mere combination or coalition for the purpose of creating a monopoly or trust; but was a legitimate business undertaking. Morawetz, § 212; *Herriman* v. *Menzies*, 115 California, 16; *Allegheny River Oil Creek Co.* v. *Pennsylvania Trans. Co.*, 83 Penn. St. 160; *Whitney Arms Co.* v. *Barlow*, 63 N. Y. 62; *Gasquet* v. *Crescent City Brg. Co.*, 49 Fed. Rep. 496; *Camden and Atlantic City Railroad* v. *May's Landing and Egg Harbor Railroad*, 48 N. J. Law, 567.

IV. The De la Vergne Company's execution of the contract is fully established.

(*a*) The answers denying its executions are not verified, and thereby the execution stands admitted. Rev. Stat. Mo. 1889, sec. 2186.

(*b*) And such admission, by failure to verify, is not merely with reference to the formal or clerical execution, but includes the admission of substantial execution. *Rothschild* v. *Frensdorf*, 21 Missouri App. 318; *Smith Purifier Co.* v. *Rembaugh*, 21 Missouri App. 390; *Beck & Pauli Lithographing Co.* v. *Obert*, 54 Missouri App. 240, 246.

(*c*) The testimony furnished by defendants themselves establishes a ratification of the contract by the De la Vergne Company, even if the president had no original authority to execute it. The corporation paid the services and expenses of the experts employed to investigate the affairs of the Consolidated Company; the directors were acquainted with the execution of the contract and the disbursement of these moneys and made no objection thereto; the by-law of the defendant corporation gives the president unlimited powers to enter into contracts on its behalf; within five days after the contract was executed the defendant company employed the Consolidated Company's former salesman, took charge of its former New York branch office and entered upon the business of selling machines built upon the Consolidated type or pattern.

(*d*) The agreed statement of facts *admits* the execution of the contract by both De la Vergne and the De la Vergne Company.

V. Where a contract admits of two constructions, one of which results in its validity and the other in its illegality, the former will be adopted. *Shore* v. *Wilson*, 9 Clark & F. 355; *Noonan* v. *Bradley*, 9 Wall. 394, 407; *Ormes* v. *Dauchy*, 82 N. Y. 443; *Curtis* v. *Gokey*, 68 N. Y. 300; *Sheffield* v. *Balmer*, 52 Missouri, 474; *Crittenden* v. *French*, 21 Illinois, 598; 2 Parsons on Contracts, (8th ed.) 168; Jones on Construction of Contracts, §§ 223, 224.

VI. Jungenfeld's executors had power to assign the stock of that estate without an order of court. At common law the legal title to the personalty of the deceased passes to his executor or administrator, who has absolute control and dominion over the same, with power of alienation; and the conveyance of the executor or administrator passes good title to the vendee or assignee. Williams on Executors, (ed. 1859)

p. 269; Woerner on American Law of Administration, sec. 331; 3 Wait's Act. & Def., 244, and cases cited; *Downing* v. *Garner*, 1 Missouri, 751; (reprint 537); *Makepeace* v. *Moore*, 10 Illinois, (5 Gilm.) 474; *McConnell* v. *Hodson*, 7 Illinois, (2 Gilm.) 640; *Walker* v. *Craig*, 18 Illinois, 116; *Thornton* v. *Mehring*, 117 Illinois, 55.

In those States where administration acts have been adopted the rule is that an executor or administrator selling personalty without the sanction of the court possessing probate jurisdiction, makes himself answerable for the full value of the property; but his sale is not void — on the contrary his *bona fide* vendee obtains good title. Administration acts are in aid, not in exclusion, of the common law powers of the legal representative. Schouler's Executors & Administrators, (2d ed.) § 346; Smith's Probate Law, (Mass.) 111; *Harth* v. *Heddlestone*, 2 Bay's Rep. (S. C.) 321; *Mead* v. *Byington*, 10 Vermont, 116; *Sherman* v. *Willett*, 42 N. Y. 146; *Dickson* v. *Crawley*, 112 N. C. 629; *Minuse* v. *Cox*, 5 Johns. Ch. 441; *Wynns* v. *Alexander*, 2 Dev. and B. Eq. Rep. 58.

An exception to this rule seems to exist in Missouri with respect to bonds and promissory notes. The cases of *Stagg* v. *Green*, 47 Missouri, 500; *Stagg* v. *Linnenfelser*, 50 Missouri, 336; *Chandler* v. *Stevenson*, 68 Missouri, 450; *Weil* v. *Jones*, 70 Missouri, 560, merely go to this effect and no further.

*State to use of Wolff* v. *Berning*, 74 Missouri, 87, merely holds that an administrator, *de bonis non*, may reclaim notes pledged by his predecessor, for his own purposes, with one having notice of that fact and of their true ownership.

These were the cases relied on in the lower court by defendants.

The Missouri administration act provides that executors or administrators may make compromises with and execute releases to debtors of the estate, upon orders from the probate court. Yet it has been held that a release without such direction or sanction will be good, the executor being personally liable for any loss caused by his lack of due care or prudence. *Mosman* v. *Bender*, 80 Missouri, 579; *Jacobs* v. *Jacobs*, 99 Missouri, 427.

And to this same effect, this court in *Maclay* v. *Equit. Life Ass. Soc.,* 152 U. S. 499.

VII. The will of Jungenfeld in express terms authorized his executors "to sell, convey and transfer any part or portion of my estate if they deem it for the advantage of those interested as legatees." Their assignment to defendants was therefore effectual, both under the will and by reason of their general legal power.

VIII. Executors may convey title to shares in a corporation organized under the laws of a foreign jurisdiction. "The assignee of stock assigned by a foreign executor may compel the transfer thereof in the courts of the State where the corporation does business." *Middlebrook* v. *Merchant's Bank of New York,* 3 Abb. App. Dec. 295 ; *Same Case on Appeal,* 41 Barb. 481; *Luce* v. *Manchester & Lawrence Railroad,* 63 N. H. 588; *Brown* v. *San Francisco Gas Light Co.,* 58 California, 426 ; *Trecothick* v. *Austin,* 4 Mason's C. C. Rep. 16.

IX. The trustees of Jungenfeld's minor son also had power to assign and transfer the minor's stock to defendants. The will gave them general power to "manage, control and invest," and it was manifestly the intention of the testator to confer upon them the power of sale. Such power need not be granted by express words, but may be inferred where the intention is apparent. 18 Am. & Eng. Enc., "Powers," 901 and cases collected ; *Danish* v. *Disbrow,* 51 Texas, 235 ; *Orr* v. *O'Brien,* 55 Texas, 149.

X. There is no presumption of law that one acting in a trust capacity has the right to sell. Persons dealing with a trustee are put on inquiry and are bound to ascertain for themselves the extent of his power, and what title, if any, they will obtain by the trustee's conveyance. *German Savings Institution* v. *De la Vergne Machine Co.,* 36 U. S. App. 184 ; *Duncan* v. *Jaudon,* 15 Wall. 165 ; *Mason* v. *Wait,* 5 Illinois, 127, 135 ; *Brewer* v. *Christian,* 9 Illinois App. 57 ; *Harmon* v. *Smith,* 38 Fed. Rep. 482; *Shaw* v. *Spencer,* 100 Mass. 382 ; *Wood's Appeal,* 92 Penn. St. 379.

XI. An agreement to transfer or assign stock is sufficiently performed by a delivery or an offer of certificates therefor

assigned in blank; *Keller* v. *Eureka Brick Machine Mfg. Co.*, 43 Missouri App. 84.

XII.  The suggestion made below by defendants that because the Consolidated Company had assigned all of its property for the benefit of its creditors, and that therefore neither it nor its stockholders possessed any right which could be conveyed by the agreement of April 16, 1891, is without merit.

Under the Illinois assignment laws a right of reconveyance from the assignee existed on an adjustment with a majority in number and amount of the creditors; and it was this right or equity which defendants purchased and the agreement expressly so recites.  In addition thereto defendants also secured the good will and trade of the Consolidated Company and the express covenant of its stockholders, plaintiffs herein. Defendants got all for which they bargained.

XIII.  The special finding of facts made by the court below is conclusive on appeal as to the matters found.  *Stanley* v. *Albany County*, 121 U. S. 535; *Allen* v. *St. Louis Bk.*, 120 U. S. 20; *Republican River Bridge Co.* v. *Kansas Pacific Railroad*, 92 U. S. 315.

Where a cause is tried upon waiver of jury and the court makes a special finding of the facts, the only question upon the writ of error is the sufficiency of the facts found to support the judgment.  The appellate court will not inquire whether the evidence was sufficient to support the findings.

Nor is error in the findings of fact subject to revision, if there was *any* evidence upon which the findings could be made.  *Hathaway* v. *Bank of Cambridge*, 134 U. S. 494. And special findings of facts by the court need only state the *ultimate facts*, not the evidence.  *Union Silver Mining Co.* v. *Taylor*, 100 U. S. 37.

And a refusal of the trial court to find incidental facts, amounting only to evidence bearing upon the ultimate facts to be found, is not a proper subject of review.  *Hathaway* v. *Bank of Cambridge*, 134 U. S. 494.

XIV.  The refusal of the trial court where a jury has been waived to give abstract declarations of law, is not error.

*Mercantile Mutual Insurance Company* v. *Folsom*, 18 Wall. 237.

XV. The contract in question, providing as it did for a distribution of $100,000 to the various plaintiffs, in the proportion in which they held stock in the Consolidated Company, amounted to a promise to each; and each was therefore warranted in bringing a separate action for the proportionate amount due him. A general action would have been improper. Bliss on Code Pleadings, § 3; *Taylor* v. *Coon*, 48 N. W. Rep. 123; *Finney* v. *Brant*, 19 Missouri, 42; *Cross* v. *Williams*, 72 Missouri, 577.

XVI. Neither party to a contract can rescind without placing the other in *statu quo ;* nor when sued for the purchase price successfully defend while retaining its benefits. *Ger. Savings Institution* v. *De la Vergne Ref. Mach. Co.*, 36 U. S. App. 184, and cases there cited; Story on Sales, § 427; Bigelow on Estoppel, (5th ed.) 552; 3 Wait's Act. & Def., 483; *Mansfield* v. *Trigg*, 113 Mass. 350; *Miller* v. *Tiffany*, 1 Wall. 298; *Andrews* v. *Hensler*, 6. Wall. 254; *Reeves* v. *Corning*, 51 Fed. Rep. 774; *Union Nat. Bank* v. *Matthews*, 98 U. S. 621; *Washburn Mill Co.* v. *Bartlett*, 54 N. W. Rep. 544.

XVII. De la Vergne having entered his general appearance in these causes in his lifetime, upon his death the suits were lawfully revived against the administrator of his estate in Missouri. Sects. 955 and 956, Rev. Stat. U. S.; sec. 2196, Rev. Stat. Missouri, 1889, ch. 33, art. 8; sec. 1995, Rev. Stat. Missouri, 1889, ch. 33, art. 1; *Gamble* v. *Daugherty*, 71 Missouri, 599.

If error was committed in entering judgment *de bonis testatoris* against De la Vergne's administrator, he having failed to appeal or sue out a writ of error, plaintiff in error, De la Vergne Company, cannot avail itself of such error against its co-defendant, nor can such judgment preclude any rights which the defendant company may have against De la Vergne's estate. They are not adversary parties in the pending suits. *McMahan* v. *Geiger*, 73 Missouri, 145; *State Bank of St. Louis* v. *Bartle*, 114 Missouri, 276; *Price* v. *Lederer*, 33 Missouri App. 426; Vol. 12, Am. and English Enc., p. 83; Century

Digest, § 3584, § 3589, Infants; § 3590, Principals and Sureties.

MR. JUSTICE BROWN, after stating the case as above, delivered the opinion of the court.

The principal question in this case is whether, under the laws of New York providing for the organization of manufacturing corporations, such corporations are authorized to purchase the stock of a rival corporation for the purpose of suppressing competition and obtaining the management of such corporation.

The facts of the case are substantially as follows: The Consolidated Ice Machine Company (hereinafter referred to as the Consolidated Company) was a corporation organized under the laws of Illinois, and was engaged in the business of manufacturing and selling refrigerating and ice-making machines. The entire amount of issued stock of such corporation was $100,000, held in various proportions by the plaintiffs in this consolidated cause. Having become insolvent, the company, on October 14, 1890, made an assignment under the general laws of Illinois, for the benefit of creditors, to one Jenkins, who, at the date of the contract sued upon, was engaged in winding up its business. The assignment on its face purported to convey to Jenkins and his successors in trust the entire real and personal "property and effects of every kind and description" belonging to the corporation, "or in which it has any right or interest," the same being fully and particularly enumerated and described in an inventory, which, however, does not appear in the record. Its assets consisted mainly of a plant for the manufacture of refrigerating and ice-making machines in Chicago; of patent rights, outstanding accounts, and the good will of its business, which appears to have been an extensive one.

It is asserted by the plaintiffs, who are stockholders in this company, that the assets exceeded in value the liabilities of the company, and that the company was not in reality insolvent, but had assumed contracts to such an extent that, with its limited capital, it was unable to carry them out.

However this may be, subsequently to the assignment, and on April 16, 1891, the company itself, by its president as party of the first part, and its stockholders as parties of the second part, entered into an agreement with the De la Vergne Refrigerating Machine Company, a corporation organized under the laws of New York, (hereinafter called the Refrigerating Company,) as party of the third part, and John C. De la Vergne, of the State of New York, president of that company, as party of the fourth part. This agreement is the basis of the action. After reciting that the Refrigerating Company was willing to acquire such right as the Consolidated Company and its stockholders could assign in and to the assets of such company; that under the laws of Illinois the Consolidated Company was not entitled to the possession of its assets in the hands of the assignee until its obligations had been discharged; that the Refrigerating Company was incorporated with a stock of $350,000 when its assets were worth $1,400,000; and that its stockholders were considering a plan of increasing the stock to $2,000,000, of which $1,000,000 was to be turned over to the Consolidated Company under the terms of the agreement:

Therefore, in view of these facts, the Consolidated Company and its stockholders covenanted with the Refrigerating Company and its president, De la Vergne, to sell and convey unto the Refrigerating Company all their right, title and interest in and to the assets of the party of the first part, subject to the payment of its obligations, and subject to the custody thereof in the legal custodian, R. E. Jenkins, assignee as aforesaid.

The second clause contained a covenant to issue to the stockholders of the Consolidated Company fully paid up stock in the Refrigerating Company to the amount of $100,000 in certain specified proportions to each stockholder.

By the fourth clause, the stockholders agreed within ten days from the date of the agreement to assign to De la Vergne, for the benefit of the Refrigerating Company, all stock of the insolvent company which had been issued, and which they guaranteed had been paid in full; and within sixty days thereafter the Refrigerating Company and its president

agreed to issue and deliver to the stockholders of the Consolidated Company stock in the Refrigerating Company to the amount of $100,000.

By the fifth clause, the stockholders in the Consolidated Company covenanted to accept in lieu of the stock of the Refrigerating Company, $100,000 in cash, at the option of De la Vergne, the president of the company.

By the seventh clause, the stockholders of the Consolidated Company agreed that for a period of ten years they would not enter into or become engaged in the selling or making of refrigerators or ice machines, directly or indirectly, within the United States, excepting the State of Montana.

Within the ten days provided by the agreement, certificates representing one thousand shares of the stock of the Consolidated Company, with written assignments executed by the parties who held the certificates, were delivered to De la Vergne, although ninety-five of these shares were held by P. J. Lingenfelder and Leo Rassieur as executors, and ninety were held by them as trustees under the will of one Jungenfeld, deceased. These shares were assigned by the parties without an order authorizing them to do so from the probate court of St. Louis, in the State of Missouri, in which the estate of Jungenfeld was in the process of administration. Two days after the receipt of these certificates De la Vergne's attorney wrote to Mr. Rassieur, calling his attention to certain technical defects, which were immediately remedied by suitable instruments of further assurance. No objection was then made that the assignments of the executors and trustees were insufficient for want of an order of the probate court authorizing the same.

In the following July demands were several times made by Mr. Rassieur for himself and his associates for the $100,000 in stock or money stipulated by the contract, but no response was received until September, when Mr. Fitch, acting for the Refrigerating Company, announced for the first time that the defendants declined to carry out their part of the contract. The reasons for the refusal do not seem to have been substantial ones. The letter contained an announcement that Mr.

De la Vergne's counsel was ready to return the papers sent to him to whomsoever was legally entitled to their custody. There was no reconveyance to the Consolidated Company of whatever was covered by the contract, the covenant of its stockholders to refrain from transacting business for ten years was never released, and none of the certificates and assignments of stock were ever delivered back. It appeared, however, that in the meantime the Refrigerating Company had secured the former New York office of the Consolidated Company; had employed its agents in making contracts with former customers of that company, which contracts were taken in the name of such agent. He was, however, furnished with the means by which they were carried out, and assignments were taken from him, which practically secured the good will of the company, although the Chicago assets were allowed to go to sale by the assignee. At this sale Mr. De la Vergne was present and offered for the tangible assets the sum of $25,000.

In their answer as amended, defendants set up as justification for a refusal to perform the contract that no assets of the Consolidated Company ever came into the possession of the defendants, since all, including the good will, had been transferred to Jenkins, the assignee, for the benefit of its creditors, and remained in his possession and control until they were disposed of under the direction of the probate court for the benefit of creditors, and that they were insufficient to discharge the liabilities; that the contract sued upon purporting to be executed on behalf of the Refrigerating Company by De la Vergne, its president, was executed without authority; that no benefit of any kind ever accrued to the company under the contract; that the company never received any of the consideration moving to it under the contract; that it never received any of the assets of the Consolidated Company, nor any of the stock; that it never in any manner ratified or approved the contract, but on the contrary rejected the same, and that the plaintiffs well knew at the time of making the contract that De la Vergne had no power or authority to bind the Refrigerating Company; that the defendants notified the plaintiffs that they would not be bound by the contract, and

that such rejection of the contract was acquiesced in by the plaintiffs, and that relying upon such acquiescence the defendants abandoned all interest in the Consolidated Company; that the contract was in reality for the stock of the Consolidated Company, and that the Refrigerating Company was not authorized by its charter, by the laws of New York or of Illinois, to purchase such stock, and that the agreement was *ultra vires;* and further, that the Refrigerating Company had no authority to stipulate for an increase in its capital stock, as was attempted under the contract, and that the contract was against public policy and wholly void.

1. The main defence pressed upon our consideration is one which does not seem to have been called to the attention of the Circuit Court, and one upon which the Judges of the Circuit Court of Appeals were equally divided in opinion. It is that the president of the Refrigerating Company had no authority to sign the contract in question, and that the agreement itself was *ultra vires* the corporation.

As the general assignment to Jenkins, executed October 14, 1890, was most sweeping in its terms, and included all the real and personal property and effects of every kind and description belonging to the corporation, or in which it had any right or interest, it was doubtless sufficient to pass the good will of the business, which was an incident either to the premises, to the name of the corporation or to the tangible property with which the business was carried on. *Churton* v. *Douglas*, 1 Johns. (Eng.) Chancery, 174, 188; *Menendez* v. *Holt*, 128 U. S. 514; *Metropolitan Bank* v. *St. Louis Dispatch Co.*, 149 U. S. 436; *Willett* v. *Blanford*, 1 Hare, 253; *Wedderburn* v. *Wedderburn*, 22 Beavan, 84; *Bradbury* v. *Dickens*, 27 Beavan, 53; *Williams* v. *Wilson*, 4 Sand. Ch. 379; *Sheppard* v. *Boggs*, 9 Nebraska, 257; *Wallingford* v. *Burr*, 17 Nebraska, 137.

This was evidently the view taken by the assignee, since he subsequently advertised the good will of the business for sale, and sold the same under an order of the court to Clarence A. Knight and Otto C. Butz, who afterward sold the same, including certain of the assets, to John Featherstone's Sons.

·It is difficult, even if the contract were legally executed, to see what assets of value belonging to the Consolidated Company passed to the Refrigerating Company under it, except perhaps the possibility that the assets would prove more than sufficient to pay the debts; or, that a settlement might be effected with a majority in number and amount of the creditors, when, under the laws of Illinois, the assignor would be entitled to a reconveyance and redelivery of the assigned assets. In such case the good will would doubtless return with the other assets to the assignor, *i.e.* the corporation, but not to the stockholders, and the right to sue for a breach of the contract would belong to the corporation, or its assignee. There was also a covenant that the Consolidated Company would not engage in a similar business within ten years from the date of the contract. The Refrigerating Company, however, did not avail itself of this opportunity to compromise with the creditors of the Consolidated Company, but allowed the assignee to dispose of the assets, which, on a forced sale, lacked $150,000 of being sufficient to pay the debts of the Consolidated Company.

In addition to this, however, there was no corporate action taken authorizing any such conveyance by the corporation, and such conveyance would not, under the laws of Illinois which conform in this particular to the general law, be within the power of the stockholders, even though they all signed it, without formal action at a meeting held for that purpose. *Sellers* v. *Greer*, 172 Illinois, 549 ; *Hopkins* v. *Roseclare Lead Co.*, 72 Illinois, 373 ; *Humphreys* v. *McKissock*, 140 U. S. 304, 312 ; *Allemong* v. *Simmons*, 124 Indiana, 199 ; *Smith* v. *Hurd*, 12 Metc. (Mass.) 371, 385 ; *England* v. *Dearborn*, 141 Mass. 590 ; Cook on Stockholders, § 709.

It is true that the president of the Consolidated Company assumed to sign the contract as president, and to bind the company, but it is scarcely necessary to say that the president of a corporation has no power as such to make a general conveyance of the assets of the corporation without at least the assent of the board of directors. *England* v. *Dearborn*, 141 Mass. 590 ; *Titus* v. *Cairo & Fulton Railroad*, 37 N. J. Law,

98, 102; *McCullough* v. *Moss*, 5 Denio, 567; *Fulton Bank* v. *New York &c. Canal Co.*, 4 Paige, 127, 134; *Walworth County Bank* v. *Farmers' Loan & Trust Co.*, 14 Wisconsin, 325; *Stokes* v. *N. J. Pottery Co.*, 46 N. J. Law, 237; Morawetz on Corp. § 537; 4 Thomp. on Corp. § 4622.

The stockholders not only assumed to convey the property of the corporation without title thereto as well as without the requisite authority so to do, but, acting as individuals, they sold "all their right, title and interest in and to the assets" of the corporation, "subject to the payment of its obligations, and subject to the custody thereof in the legal custodian, R. E. Jenkins, assignee as aforesaid." As this transfer was no broader in its terms than those employed in the assignment by the company to Jenkins, and as the stockholders in any event would not have the power to transfer the assets of the corporation, this sale could operate only upon their stock; and that this was the intention is evident from the fourth clause of the contract, by which the stockholders agreed, within ten days from the date of the contract, to assign to De la Vergne all the stock of the Consolidated Company which had been issued, and which they guaranteed had been paid in full, and also by the fact that the certificates for such stock were all assigned by the holders and forwarded to De la Vergne. But again, it is difficult to see what the Refrigerating Company gained by this transfer of stock. Doubtless it gave them the control of the Consolidated Company, but as that company had assigned everything to Jenkins, including the good will, there was nothing left of value in the ownership of the stock. Apparently it could only operate upon the possibility that, by some favorable turn of fortune, the assets might prove more than sufficient to pay the debts, and thus the stock would become of some real value. However this may be, it is quite evident that one of the main objects of the transfer was to get possession of the stock and the right to use the name of the Consolidated Company, assuming that this did not pass to the assignee as part of the good will of the business.

But as the powers of corporations, created by legislative act, are limited to such as the act expressly confers, and the

enumeration of these implies the exclusion of all others, it follows that, unless express permission be given to do so, it is not within the general powers of a corporation to purchase the stock of other corporations for the purpose of controlling their management. *First National Bank* v. *National Exchange Bank*, 92 U. S. 122, 128; *Sumner* v. *Marcy*, 3 Wood & Minot, 105; Morawetz on Corp. sec. 431; 1 Thompson on Corp. § 1102; *People* v. *Chicago Gas Trust Co.*, 130 Illinois, 268; *Milbank* v. *New York, Lake Erie & Western Railroad*, 64 How. Pr. 20; *Mechanics' &c. Bank* v. *Meriden Co.*, 24 Connecticut, 159.

Not only is this true as a general rule, but by the law of the State of New York, under which this corporation was organized, *i.e.* "An act to authorize the formation of corporations for manufacturing, mining, mechanical and chemical purposes," passed February 17, 1848, it was declared in section eight that "it shall not be lawful for such company to use any of their funds for the purchase of any stock in any other corporation." This language is clear and explicit, and evidently covers purchases of stock in other corporations, whether engaged in the same or different business.

In this connection, however, our attention is called to an act passed by the legislature of New York, June 7, 1853, (chapter 333,) amendatory of the act of 1848, the second section of which enacts that "the trustees of such company may purchase mines, manufactories and other property necessary for their business, and issue stock to the amount of the value thereof in payment therefore." The position of the plaintiffs in this connection is that, under the authority to purchase "other property necessary for their business," it was competent for manufacturing corporations to purchase the stock of other similar corporations. But we do not so read the act. Its evident object was to permit manufacturing corporations to purchase mines from which they could extract their own ore, or manufactories of raw material, such as pig iron or lumber, which could furnish to them material to be worked up into their own products; and in case such purchases involved a larger outlay than their present resources would

justify, to issue new stock " to the amount of the value thereof in payment therefor." But there is nothing to indicate that the legislature intended to authorize them to purchase the stock of competing corporations, or corporations engaged in other business. It is only property necessary for their own current business they were authorized to purchase.

Another act amending the general corporation act of 1848, passed April 28, 1866, (chapter 838,) was intended for a similar purpose. By section three it was enacted that "It shall be lawful for any manufacturing company heretofore or hereafter organized under the provisions of this act or the act hereby amended, to hold stock in the capital of any corporation engaged in the business of mining, manufacturing or transporting such materials as are required in the prosecution of the business of such company, so long as they shall furnish or transport such materials for the use of such company, and for two years thereafter and no longer; and the trustees of such company shall have the same power with respect to the purchase of such stock and issuing stock therefor as are now given by law with respect to the purchase of mines, manufactories and other property necessary to the business of manufacturing companies. But the capital stock of such company shall not be increased without the consent of the owners of two thirds of the stock, to be obtained as provided by sections twenty-one and twenty-two of the act hereby amended."

The object of this act was evidently much the same as that of the prior act of 1853, that is, to enable manufacturing corporations to produce their own ore and manufacture their own raw materials. To meet the exigencies of this statute it is necessary that the company, whose stock is purchased, should at the time of the purchase be engaged in the business of mining, manufacturing or transporting such materials as are required in the prosecution of the business of the purchasing company; and the right is limited to such time as they shall furnish or transport such materials for the use of such company, and for two years thereafter. It clearly has no application to a case where a manufacturing company pur-

chases the stock of an insolvent rival concern which has ceased to do business, and whose stock is bought for the evident purpose of preventing a reorganization, and of obtaining its patronage.

. In the Revised Statutes of New York of 1889, c. 18, vol. 3, p. 1959, there is also an act, to which our attention is called by a supplemental brief, permitting manufacturing companies to increase or diminish their capital stock to any amount which may be sufficient and proper for the purposes of the corporation, and also to extend their business to any other manufacturing business subject to the provisions of the act.

That neither of these acts were intended to give authority to corporations to purchase stock of other corporations engaged in the same business is evident from a subsequent act approved June 7, 1890, to take effect May 1, 1891, the fortieth section of which provides that ". . . no corporation shall use any of its funds in the purchase of any stock of its own or any other corporation, unless the same shall have been *bona fide* pledged, hypothecated or transferred to it, by way of security for, or in satisfaction or part satisfaction of, a debt previously contracted in the course of its business, or shall be purchased by it at sales upon judgments, orders or decrees which shall be obtained for such debts or in the prosecution thereof. Any domestic corporation transacting business in this State, and also in other States or foreign countries, may invest its funds in the stocks, bonds or securities of other corporations owning lands in this State or other States, if dividends have been paid on such stocks continuously for three years immediately before such loans are made, or if the interest on such bonds or securities is not in default, and such stock, bonds and securities shall be continuously of a market value twenty per cent greater than the amount loaned or continued thereon."

Had the former acts given the unlimited authority to purchase insisted upon by the plaintiffs, this act would have been entirely unnecessary, and instead of enlarging the power previously possessed, would have operated as a restriction upon it. That this act of 1890 does not assist the plaintiffs is evident not only from the fact that the act did not take effect

until after the contract was made, but from the further fact that it merely authorizes corporations to *invest their funds* in the stocks, bonds or securities of other corporations if dividends have been paid for three years before the loans are made ; or if the interest on their securities is not in default, and such securities are worth twenty per cent greater than the amount loaned thereon. This act evidently refers to loans and not to purchases, since the section expressly provides that no corporation shall use its funds in the purchase of any stock, either of its own or any other corporation, unless by way of security for antecedent debts.

The truth is, that the legislature of New York, instead of repealing the prohibitory clause in the original act of 1848, concerning the purchase of stock in other corporations, has modified it but slightly, by slow degrees, and in special cases, to enable a manufacturing corporation to control more perfectly its own legitimate business operations, and has thereby manifested the more clearly its intention to preserve the original inhibition.

Our conclusion upon this branch of the case is that, as the main, if not the sole, object of the purchase from the plaintiffs was to acquire their stock in the Consolidated Company, such purchase was *ultra vires* the Refrigerating Company.

2. Is this defence available to the Refrigerating Company ? Whatever doubts might have been once entertained as to the power of corporations to set up the defence of *ultra vires* to defeat a recovery upon an executed contract, the rule is now well settled, at least in this court, that where the action is brought upon the illegal contract, it is a good defence that the corporation was prohibited by statute from entering into such contract, although in an action upon a *quantum meruit* it may be compelled to respond for the benefit actually received.

The earliest case in which this doctrine is distinctly laid down is that of *Pearce* v. *Madison & Indianapolis Railroad*, 21 How. 441, in which it appears that two railroad companies, which had been consolidated, gave their promissory notes in payment for a steamboat to run in connection with the railroads. It was held that, as there was no authority in the

railroad companies to engage in running steamboats, there could be no recovery on the notes, and that as the plaintiff was not the owner of the boat and had sued upon the notes as an indorsee, there could be no recovery. The same doctrine has been applied to leases *ultra vires* a corporation, and it has been uniformly held that there could be no recovery upon the lease itself, though there might be in an action for use and occupation of the property. *Pittsburgh, Cincinnati &c. Railway* v. *Keokuk & Hamilton Bridge Co.,* 131 U. S. 371, 384; *Central Transportation Co.* v. *Pullman's Palace Car Co.,* 139 U. S. 24, 48; *S. C.,* 171 U. S. 138; *McCormick* v. *Market Bank,* 165 U. S. 538, 550; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *California Bank* v. *Kennedy,* 167 U. S. 362; *Marble Co.* v. *Harvey,* 92 Tennessee, 116; *Union Pacific Railway* v. *Chicago, Rock Island and Pacific Railway Co.,* 163 U. S. 564.

The doctrine that no recovery can be had upon the contract is based upon the theory that it is for the interest of the public that corporations should not transcend the limits of their charters; that the property of stockholders should not be put to the risk of engagements which they did not undertake; that if the contract be prohibited by statute every one dealing with the corporation is bound to take notice of the restrictions in its charter, whether such charter be a private act or a general law under which corporations of this class are organized. *Zabriskie* v. *Cleveland, Columbus &c. Railroad,* 23 How. 381, 398; *Thomas* v. *Railroad Co.,* 101 U. S. 71; *Pennsylvania Co.* v. *St. Louis, Alton & Terre Haute Railroad,* 118 U. S. 290, 630; *Oregon Railway Co.* v. *Oregonian Railway Co.,* 130 U. S. 1, 25; *Railway Companies* v. *Keokuk Bridge Co.,* 131 U. S. 371, 384.

As the action in this case is upon the contract, and as the contract was prohibited by the charter of the Refrigerating Company, there can be no recovery upon it.

The difficulty with the position of the plaintiffs in this case is this: If the purchase of the stock was the main object of the contract the consideration was an illegal one, and the promise of the Refrigerating Company to furnish its own

stock in payment was *ultra vires*. If, upon the other hand, the object of the contract was to obtain the assets and good will of the Consolidated Company upon payment of its debts, then the promise of the Refrigerating Company to pay the plaintiffs therefor was without consideration, since the assets were the property of the Consolidated Company and not of its stockholders, and anything realized by the sale of such assets belonged to the company or its assignee, and should be devoted first to the payment of its debts. If there were anything of value beyond the control of the stock which passed to the Refrigerating Company under the contract, the assignee could not be dispossessed of it until all the debts were paid or compromised, when it would revert to the corporation but not to the plaintiffs. Their title to sue must rest upon their ownership of the stock, and if the defence of *ultra vires* be sustained, we know of no theory upon which the plaintiffs can recover. It certainly cannot be true that the plaintiffs can take to themselves the hundred thousand dollars stipulated by this contract and leave creditors of the corporation unpaid to the extent of $150,000.

*The judgment of the Circuit Court of Appeals and of the Circuit Court must therefore be reversed, and the case remanded to the Circuit Court for the Eastern District of Missouri with directions to grant a new trial.*

MR. JUSTICE BREWER and MR. JUSTICE McKENNA dissented.