JOSEPH BANCROFT & SONS CO. v. BLOEDE.

(Circuit Court of Appeals, Fourth Circuit. February 7, 1901.)

1. CORPORATIONS—ISSUE OF STOCK IN PAYMENT FOR PROPERTY—LEGALITY.

A corporation was organized under the general incorporation law of a state, which provided that nothing but money should be considered as payment of any part of the capital stock, except as otherwise provided, but in a subsequent section authorized the directors of any company to purchase mines, manufactories, "or other property necessary for their business," and to pay for the same by an issue of paid-up stock. The business of such corporation was stated in its articles to be "the manufacturing, bleaching, dyeing, and finishing of cotton or other fabrics, and every other business incident thereto or that may be combined therewith." The man who had been the consulting chemist of the company for many years was a manufacturer of dyes, pulp colors, finishing oils, and chemicals in accordance with secret formulas and processes invented and owned by him, many of which dyes, etc., were exclusively used by the company in its business. At the instance of the company, he formed a corporation to which he conveyed his manufacturing plant, and all his rights in such dyes, formulas, etc., and, under authority of a vote of the stockholders, the directors of the manufacturing company issued to him paid-up stock in such company in exchange for shares in the corporation so organized by him. Held, that such issue of stock was for the purchase of property legitimately necessary or proper in connection with the business of the company, and was within the powers conferred upon it by the statute and its articles.

2. SAME—EVIDENCE TO SUSTAIN VALIDITY.

Upon the issue as to the validity of the stock so issued, it was proper for the court to admit evidence to show the intimate relations between the business of the two corporations, and the importance and value to the corporation issuing the same of owning an interest in the other company, as well as of having its chief stockholder interested in its own business.

3. SAME — POWER TO HOLD STOCK IN ANOTHER CORPORATION—CONSTRUCTION OF STATUTE.

Where the incorporation laws of a state at no time prohibited a corporation organized thereunder from owning stock in another corporation, the adoption of a new constitution, and the enactment of laws pursuant to

its provisions, expressly giving such right, may fairly be held to show, at least, that the previous acquiring of such stock by a corporation was not against the public policy of the state, if not to expressly legalize such transaction.

In Error to the Circuit Court of the United States for the District of Maryland.

See 98 Fed. 175.

John N. Steele and Herbert H. Warde (Benjamin Nields and William S. Hilles, on the brief), for plaintiff in error.

Robert Biggs and George R. Willis, for defendant in error.

Before GOFF and SIMONTON, Circuit Judges, and PURNELL, District Judge.

SIMONTON, Circuit Judge. This case comes up on writ of error to the circuit court of the United States for the district of Maryland. The plaintiff in error, the Joseph Bancroft & Sons Company, defendant below, is a corporation under the laws of the state of Delaware. The constitution of that state in existence in the year 1883 (article 2, § 17), gave power to the legislature to enact a general incorporation act to provide incorporation for religious, charitable, literary, and manufacturing purposes, for the preservation of animal and vegetable food, building and loan associations, and for draining of lands, with a provision that no attempt shall be made in such act or otherwise to limit or qualify the power of revocation reserved to the legislature in the same section. Pursuing the authority thus conferred, the legislature of Delaware, on 14th March, 1883, passed an act entitled "An act concerning private corporations." Section 10 of that act provided for the formation of private corporations for various purposes, among others for carrying on any manufacturing business. Section 29 provided: "Nothing but money shall be considered as payment of any part of the capital stock of any company organized under this act, except as hereinafter provided, for the purchase of property." And section 30 provided that the directors of any company incorporated under this act may purchase mines, manufactories, or other property necessary for their business, and issue stock to the amount of the value thereof in payment therefor, and the stock so issued shall be declared and taken to be full-paid stock, and not liable to any further call, nor shall the holder thereof be liable for any further payments, under any of the provisions of this act. On the 21st September, 1889, William P. Bancroft and Samuel Bancroft, Jr., who had up to that time done business under the firm name of Joseph Bancroft & Sons, applied for a certificate of incorporation, under this act, as the Joseph Bancroft & Sons Company, naming themselves, with John Bancroft, Henry B. Thompson, John Hutton, and W. T. Porter, as corporators. The object of the incorporation, as set forth in the certificate, was this: "The object of the incorporation shall be the manufacturing, bleaching, dyeing, and finishing of cotton or other fabrics, and every other business incident thereto or that may be combined therewith." The total amount of stock was $1,000,000; the amount paid in before commencing business, at least $500,000.

This company had close relations with Victor G. Bloede. Bloede was and is a chemist. From 1875 until 1895 he held the position of consulting chemist in the business, first of the firm, and then of the corporation, and was and is also a manufacturer of dyes, pulp colors, finishing oils, and chemicals, after secret formulas of his own discovery, for use in secret processes of his own invention. These dyes, colors, oils, and chemicals were used largely by the firm and by the corporation. In 1893, Victor G. Bloede, greatly, if not wholly, at the instance and persuasion of the Bancroft people, formed a corporation, under the laws of Maryland, known as the "Victor G. Bloede Company," with an authorized capital of $150,000, of which $100,000 was issued in stock. Bloede turned into this corporation, in payment for 994 shares of its capital stock, his entire plant, fixtures, stock, processes, and formulas, and the entire business theretofore conducted by him, including the dyes, pulp colors, finishing oils, and processes which had been and were being used by the Bancroft Company. On the 5th May, 1893, a meeting of the stockholders of the Joseph Bancroft & Sons Company authorized its board of directors to issue 475 shares of the capital stock of the company, par value $47,500, in exchange for a like number of shares for the same amount of a corporation to be organized under the laws of Maryland, to be called the "Victor G. Bloede Company." On 13th July, 1893, the board of directors adopted a resolution, which, after reciting and referring to the authority conferred by the stockholders in their meeting, and to the fact that the Victor G. Bloede Company was in fact incorporated, provided:

"Be it resolved, first, that the president and treasurer of the Joseph Bancroft & Sons Company be, and they are hereby, authorized to issue and certify 474 shares of this company to Victor G. Bloede, to be exchanged with him for certificates of the same number of shares of the said Victor G. Bloede Company, and report the same to this board after said exchange is executed; it being mutually agreed and understood between Victor G. Bloede and this company that these 474 shares will not participate in, or be entitled to, any interest in the next dividend to be declared out of the earnings of this company, being No. 14, of 4 per cent., but to participate in, and be entitled to, all dividends subsequent to No. 14, of 4 per cent., aforesaid."

In pursuance of this resolution, the Bancroft Company on 13th July, 1893, issued to Mr. Bloede certificate No. 32, for 474 shares of its capital stock,—an original issue,—and Bloede transferred to the Bancroft Company 474 shares, which had been issued to, and were held by, him in the Bloede Company. This arrangement having been perfected, and dividends of the Bancroft Company having been paid to each stockholder, including Bloede, the stockholders of the first-named company became dissatisfied. In a letter of 1st July, 1894, is seen the first evidence of dissatisfaction. In that the writer, H. B. Thompson, one of the officials and stockholders of the Bancroft Company, writes Mr. Bloede. In that he calls his attention to certain figures, showing the great inequality of the advantages derived from the arrangement between him and the Bancroft Company, and asks if these are in keeping with the spirit of the arrangement as he understood it. No suggestions are made against the legality of the arrangement, and no definite plan is suggested for removing the

inequality. He simply commends the statement to the careful consideration of Mr. Bloede. Meanwhile Mr. Bloede regularly received his dividends on the stock transferred to him, and continued to do so until January, 1895. After that date he was refused all further dividends. Some litigation followed, and finally Victor G. Bloede brought his action against the Joseph Bancroft & Sons Company in the Baltimore city court, among other things, for the share in the dividends declared by the Bancroft Company accruing to him by reason of his ownership in the 474 shares. This cause was removed into the circuit court of the United States for the district of Maryland. When it came into this court every other claim was eliminated except that of the dividends on this stock. The issues were made, and they were tried before the court without the intervention of a jury. The Bancroft Company set up as its defense to the action that the issue of its paid-up stock to the plaintiff, Bloede, was ultra vires and void. This was the sole question in the case. The circuit court gave judgment for the plaintiff. A writ of error was issued, and the case is here on the assignments of error.

Two questions arise under these assignments of error: First. Was the issue of its paid-up stock by the Bancroft Company in purchase of or exchange for stock held by Victor G. Bloede in the Bloede Company ultra vires? Second. Was the circuit court in error in admitting testimony tending to show the relations between the Bancroft Company and Bloede, and the importance and necessity to the Bancroft Company of the dyes, colors, and various specialties used in the production of cotton fabrics, and transferred by Bloede to the Bloede Company?

Was the issue of its paid-up stock by the Bancroft Company in purchase of or exchange for the stock held by Bloede in the Bloede Company ultra vires? There can be no doubt that a corporation, instituted for a specific purpose, such as banking, cannot deal in stocks,— purchase them for investment or speculation. Bank v. Kennedy, 167 U. S. 362, 17 Sup. Ct. 831, 42 L. Ed. 198; Schofield v. Banking Co., 39 C. C. A. 76, 98 Fed. 271. And, unless there is express power given in its charter to do so, a corporation cannot purchase the stock of other corporations for the purpose of controlling their management. De La Vergne Refrigerating Mach. Co. v. German Sav. Inst., 175 U. S. 55, 20 Sup. Ct. 20, 44 L. Ed. 65. But the purchase of stock by a corporation in other corporations, such purchase being incidental to its business, is not unlawful. First Nat. Bank v. National Exch. Bank, 92 U. S. 122, 23 L. Ed. 679. Indeed, the rule may be expressed more generally. A corporation can exercise no power or authority which is not granted to it by the charter under which it exists, or by some other act of the legislature to which it owes its charter. Oregon R. & Nav. Co. v. Oregonian R. Co., 130 U. S. 1, 9 Sup. Ct. 409, 32 L. Ed. 837. To determine, therefore, the powers of this Delaware corporation, we must look to its charter, and, as it was incorporated under a general law, we must take notice of the documents recorded or filed upon its application for a charter, upon which, as authorized and controlled by the general law, depend the existence of the corporation, the extent of its corporate powers, its

capacity to act as a corporation. McCormick v. Bank, 165 U. S. 538, 17 Sup. Ct. 433, 41 L. Ed. 817.

The Joseph Bancroft & Sons Company was incorporated in 1889, under the provisions of the general act of 1883. Its business, as set out in its application, was "the manufacturing, bleaching, dyeing, and finishing of cotton and other fabrics, and any other business incident thereto or that may be combined therewith." Under its charter, the directors could purchase mines, manufactories, or other property necessary for their business, and issue paid-up stock therefor. The directors, under express instructions of the stockholders, purchased shares of stock in the Bloede Company. Was this property necessary for their business,—the manufacturing, bleaching, dyeing, and finishing cotton or other fabrics, and any other business incident thereto or that may be combined therewith?

That shares of stock are property goes without saying. They are bought, sold, taxed, bequeathed, and distributed as any other property may be. Was this property necessary for the business of the Joseph Bancroft & Sons Company? This is a question depending upon circumstances to be developed in testimony. The court below very properly permitted the introduction of such testimony. It appears that Victor G. Bloede was for many years, covering the years from 1875 to 1895, the consulting chemist of this company; that he was a man of science and invention; that he was a manufacturer of dyes, pulp colors, finishing oils, and chemicals; that the formulas of these were secret, his own discovery, to be used in secret processes of his own invention. Very many of them were not on the market, and were in use by the Bancroft Company alone. This was secured to the Bancroft Company by an agreement that during their joint relations with Bloede the colors and materials should not be sold to any one outside of themselves for any purpose, in the judgment of the company, in conflict with its interests. The lines of goods turned out by the Bancroft Company, in which these discoveries and manufactures of Bloede were used, were dependent upon their use and the processes for their application. This being the case, it was for the interests of the Bancroft Company greatly, if not essentially to its interests, to secure permanent control of these valuable aids in their business. The individual Bloede was mortal. When his life ended, these discoveries, secret formulas, and secret processes of his would pass to his legal representatives,—perhaps would be disclosed to the world at large or get into the hands of competitors. To secure the services of Bloede during his life, and to perpetuate the agreements made with him, the controlling officials in the Bancroft Company thought that an incorporation would prove effective. They felt that it was essential for their company that the relationship between Bloede and it should be cemented; that it was important that the business conducted by Bloede should be put into a condition of permanency; that such permanency could be secured, and Bloede's attachment cemented, by getting him a holding of some of their stock. To this end they induced him to form the Victor G. Bloede corporation, into which he should turn the whole of his plant, his discoveries, his secrets, and his business, and this was done. It may well be

believed that at that time this was considered the best mode of promoting the business of the company, and to be a course necessary to its business. Carrying out this, the Bancroft Company purchased from Bloede 474 shares in this corporation, so formed at their instance, for paid-up shares of their own stock. The purchase removed all risks of the life of Bloede; gave an influential voice in the production, control, and management of materials of great value to and directly in the line of their business. It gave them an interest in a business incident with their own, and which could easily and naturally combine with their own. It would appear that this purchase was directly under the intention and within the power of its charter.

There is another point of view from which this case can be considered, and which impressed the circuit court in reaching its conclusion. In 1897 the state of Delaware adopted another constitution. Article 9 of this instrument provided for the formation of corporations under general laws, and forbade special legislation, either in the creation of corporations, or in the amendment, renewal, or revival of their charters. Section 3 of this article is in these words:

"No corporation shall issue stock, except for money paid, labor done or personal property or real estate or leases thereof actually acquired by such corporation, and neither labor nor property shall be received in payment of stock at a greater price than the actual value at the time the said labor was done or property delivered or title acquired."

The legislature of Delaware, under the authority of this constitution, passed an act providing a general corporation law, approved 10th March, 1899. The second section of that act made provision for the powers to be enjoyed by every corporation created under its provisions. The third section declares that every corporation (not confining itself to corporations created under that act) shall possess and exercise all the powers and privileges contained in this act, and the powers expressly given in its charter, so far as the same are necessary or convenient to obtain the objects of its charter, and shall be governed by the provisions, and be subject to the restrictions and liabilities, in this act contained, so far as the same are appropriate to, and not inconsistent with, its charter. This is clearly a general provision, applicable to all charters before as well as under this act. Section 133 gives the right to any corporation created under this act to hold stock in other corporations. Section 139 repeals all inconsistent laws, preserving, however, all existing rights, privileges, and immunities. No constitutional or statutory provision of the state of Delaware had ever forbidden a corporation from holding stock in another corporation. This act, at the least, shows such holding not to be against the public policy of the state. So when, for the purposes of its business, to promote its interests, and to secure permanency in the supply to it of important and valuable material used in manufacture, the Bancroft Company purchased from Bloede his stock in the Bloede Company, the mere fact that the property purchased was stock in another corporation did not, in itself, make such purchase unlawful and against public policy. The circuit court went further than this. It held that, even were the original exchange or purchase of stock not authorized by the

106 F.—26

charter of the Bancroft Company, the passage of the act of 1899 legalized the transaction and gave it validity. For this position, Gross v. Mortgage Co., 108 U. S. 477, 2 Sup. Ct. 940, 27 L. Ed. 795, and In re Buffalo, N. Y. & E. R. R. Co. (Sup. Ct.) 37 N. Y. Supp. 1048, are cited. The last cited case seems almost on fours with the case at bar. It is, however, unnecessary to pass upon this point. For the reasons heretofore given, the conclusion reached by the circuit court is approved, and its judgment is affirmed.