## ANDREW JERGENS CO. v. WOODBURY, Inc., et al.

(District Court, D. Delaware.   March 12, 1921.)

No. 370.

1. **Trade-marks and trade-names ⬚34—Contract held not void as transfer in gross, but as transfer of right to use in connection with sale of toilet preparations.**

    A contract whereby an institute, which had been engaged in the treatment of skin diseases and the sale of preparations incidental thereto, transferred to a company the right to use its trade-mark and trade-name in the latter's business, which under its charter included the sale of the preparations, as well as the treatment, from which transfer were excepted rights theretofore granted to other corporations, the only one shown being a grant to complainant of the right to use the trade-mark in connection with the sale of specified articles, and also excepted the right of the institute to use the mark so long as it continued in the business, granted the right to use the mark in connection with the sale of the preparations, as well as in the treatment of diseases, so that the transfer of the trade-mark was not void as a transfer in gross.

2. **Contracts ⬚153—Construction which renders exception meaningless should be avoided.**

    A construction of a contract which renders meaningless an exception expressed therein should be avoided.

3. **Trade-marks and trade-names ⬚34—Sale of list of patients who bought marked preparations sufficient to support transfer of trade-mark.**

    A sale by an institute, which was engaged in the treatment of skin diseases and the sale of preparations in connection therewith, of its list of patients of the institute, who were also the customers of the preparations, was a sale of the good will of the institute, so that the transfer of the trade-mark in connection therewith was not void as a transfer in gross.

4. **Trade-marks and trade-names ⬚35—Contract held an assignment of trade-mark, not a license.**

    A contract by a trade-mark owner, giving to a corporation, in consideration of all of the stock of the company, the exclusive license to use the trade-mark, with certain exceptions, which otherwise disclosed a purpose to transfer the rights in the trade-mark, subject only to those exceptions, was not a mere license, personal to the company, to use the mark, but was in legal contemplation an assignment, notwithstanding the use of the word "license."

5. **Trade-marks and trade-names ⬚35—Assignment of trade-mark held to include owner's name used in connection therewith.**

    An assignment of a common-law trade-mark, identified by reference to a certificate of registration of the mark as applied to a facial soap, included in the assignment the name of the original maker, which had accompanied the trade-mark as previously used, and also the last name of the maker, by which abbreviated name the commodities had become known to the purchasing public in connection with the trade-mark.

6. **Trade-marks and trade-names ⬚32—Abandonment is matter of intention.**

    The abandonment of a trade-mark is a matter of intention.

7. **Trade-marks and trade-names ⬚32—Facts held not to show intention to abandon.**

    The fact that an institute, which owned a trade-mark and had been engaged in the treatment of skin diseases, which was not authorized by its charter, thereafter transferred its trade-mark rights to a corporation, of which it owned all the stock, and which was authorized to treat diseases,

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

as well as to sell the preparations, negatives an intention to abandon, so that the rights to the trade-mark were not lost by temporary nonuser.

8. **Trade-marks and trade-names ⬤⟿39—Want of consideration to owner of trade-mark held to invalidate license contract, as abrogation of prior agreement.**

In a contract between a corporation, which was in fact the owner of a trade-mark, subject to the right of a partnership to use it on certain preparations, and the partnership, whereby the partnership, for a consideration moving to it and future royalty payments, licensed the corporation to use the trade-mark on preparations other than those on which the partnership was licensed to use it, there was no consideration to the corporation which would make the contract binding on the corporation as an abrogation or novation of the previous contract by which the corporation had acquired the trade-mark.

9. **Corporations ⬤⟿404(2)—President cannot make contract divesting corporation of all assets.**

In the absence of corporate authorization or ratification, a contract which divests the corporation of all its assets is beyond the power of the president to make.

10. **Corporations ⬤⟿426(1)—Sale of assets by president held not ratified.**

A contract by the president of a corporation, transferring all its assets, was not ratified by the corporation, where the next year it claimed to be the owner of the assets, and soon thereafter repudiated the alleged contract, which repudiation was acquiesced in by the other party.

11. **Corporations ⬤⟿404(2)—Transferee's ownership of all stock does not authorize president to transfer all corporate assets.**

The fact that a transferee of all the assets of a corporation owned all the capital stock at the time of the transfer is not equivalent to antecedent corporate authority for the transfer by the president.

12. **Contracts ⬤⟿82—Expressed consideration impliedly excludes another consideration.**

The expression of one consideration in a written contract impliedly excludes any other consideration therefor.

13. **Corporations ⬤⟿458—Transfer of stock to corporate president for his services is not consideration for sale of assets by corporation.**

The fact that the transferee of all of the assets of a corporation, who also owned all the stock of the corporation, afterwards transferred the stock to the corporation's president in consideration for services rendered by him to the transferee, is not consideration to the corporation for the transfer of its assets.

14. **Evidence ⬤⟿231(3)—Rights of transferee from corporation not affected by statements of officer after the transfer.**

The transferee of a trade-mark previously owned by a corporation is not affected as to the rights so acquired by statements of an officer of the company made after the transfer.

15. **Estoppel ⬤⟿98(2)—Transferee held not estopped by inconsistent statements by transferor in other proceedings involving different issues.**

The transferee of trade-mark rights from an individual is not estopped as to such rights by the position taken by the individual in bankruptcy proceedings of a corporation, which also transferred its trade-mark to the transferee, and in a suit by the trustee in bankruptcy in which the individual was attempting to protect his rights as a minority stockholder, where the rights which he transferred were those which he held as an individual, and not as a stockholder.

16. **Estoppel ⬤⟿54—Party claiming must be ignorant of real facts.**

Misrepresentations on which estoppel in pais can be based must consist of facts, not opinions, and the party claiming the estoppel must have been ignorant of the real facts, so that complainant cannot rely on

estoppel without showing that it was ignorant of the facts concerning which the representations were made.

**17. Trade-marks and trade-names ⊜⇒45—Registration does not enlarge rights of owner.**

The registration of an existing common-law trade-mark does not confer any greater rights in the use of the mark on the registrant, nor diminish the rights of others entitled to the use thereof.

**18. Trade-marks and trade-names ⊜⇒95 (4)—Threat to infringe, not shown to have been sanctioned by defendant, does not authorize injunction.**

A bill to enjoin infringement of a trade-mark must be dismissed as to one defendant, where there had been no infringement, and the only threat to infringe was based on a circular issued by a third person, which was not shown to have been sanctioned by that defendant.

**19. Trade-marks and trade-names ⊜⇒93 (3)—Transferee held not to infringe rights of prior transferee for specified articles.**

Where complainant had acquired exclusive right to use a mark on certain specified toilet preparations, evidence *held* not to show that defendant had infringed complainant's rights, though it used the trade-mark on other toilet preparations, and thereby some confusion had arisen in the minds of the public as to the origin of the different articles.

**20. Trade-marks and trade-names ⊜⇒64—Individual can use own name, which has acquired secondary meaning.**

An individual has, subject to certain conditions, the right to use his name in his business, although his surname may have acquired a secondary meaning, and he has also the right to transfer that business to a corporation bearing his name.

**21. Trade-marks and trade-names ⊜⇒61—Transfer of right in connection with stated articles includes only those articles and others closely resembling them.**

The transfer of exclusive right to use an existing trade-mark on specified toilet preparations gives the transferee the right to prevent the use of such mark by others only for the same preparations, or for those so closely resembling them as to be calculated to deceive and mislead the public to believe that they are identical with those named in the transfer.

In Equity. Suit by the Andrew Jergens Company against Woodbury, Incorporated, and others. Decree rendered, dismissing the bill.

See, also, 271 Fed. 43.

Thomas F. Bayard, of Wilmington, Del., Keyes Winter, of New York City, and Walter A. De Camp and Dudley V. Sutphin, both of Cincinnati, Ohio, for plaintiff.

John Robert Taylor and Gustav Drews, both of New York City, for defendants.

MORRIS, District Judge. This is a suit to enjoin alleged trade-mark infringement and unfair competition. The complainant, the Andrew Jergens Company, an Ohio corporation, asserts that it has the right to the exclusive use of the name "Woodbury," or "Woodbury's," and of a mark consisting of a representation of a head minus the bust and neck, commonly described as a "neckless head," upon or in connection with toilet articles and dermatological preparations, and that the defendants, Wm. A. Woodbury Distributors, Inc., Woodbury, Inc., and Woodbury System, Inc., are, in violation of complainant's rights, using or threatening to use the name and mark upon similar articles

⊜⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and preparations. One defendant, the Distributors, denies that the plaintiff's rights in either the name or mark are exclusive, and, while admitting that it, the Distributors, uses the mark and the name upon certain toilet articles and preparations, and the name upon certain others, it denies that in so doing it has entered the field of complainant's rights. The remaining defendants claim that the complainant has failed to show that either of them has used or threatened to use the name or mark as charged. The case was tried in open court upon bill, answer, oral testimony, and documentary evidence. The relief sought is a permanent injunction and an accounting.

The basic issues are: (1) What is the scope and extent of complainant's rights in the mark and name? and (2) Have its rights therein been infringed by the defendants or any of them? The complainant does not contend that it was the first to adopt and use the name or mark, but says that its rights "are based upon and were acquired by it through two contracts, one dated June 13, 1901, * * * and the other dated March 6, 1909." The 1901 contract was made by and between John H. Woodbury, John H. Woodbury Dermatological Institute, a New York corporation, P. R. McCargo, and Wm. A. Woodbury, of the one part, and Andrew Jergens & Co., a copartnership, of the other part. (As complainant's succession in title from the partnership through a New York corporation of similar name is not in issue, they will be considered herein as a single entity and referred to as the complainant, or the Jergens Company.) Prior to 1901 John H. Woodbury and the John H. Woodbury Dermatological Institute were successively the owners of and engaged in the business of making and selling certain proprietary medicated dermatological preparations and toilet articles of the general class of detergents, including, among other things, soap, creams, powders, shampoos, tonics, and lotions, all of which were adapted for use in the care of the human skin, hair, or teeth. The mark was first adopted by John H. Woodbury and used upon the package or receptacle for each commodity. As stated by the complainant:

"He appropriated that symbol as a mark of the entire class of toilet articles and preparations."

The essential feature of the mark, the neckless head, was usually accompanied, above, by the words "John H. Woodbury's" which were immediately followed by the name of the commodity upon which the mark was being used. Beneath, and at the sides of the head, printed matter in the nature of directions for using the article ordinarily appeared. In the year 1889 John H. Woodbury caused that mark, accompanied by his name and other printed matter, as above indicated, to be registered (serial No. 16,958) for facial soap. The next year he caused the John H. Woodbury Dermatological Institute to be incorporated in New York, and in consideration of its entire capital stock transferred to it all his rights, trade-marks, and good will. The Institute prospered. It manufactured and sold, not only the eight articles thereafter sold to the Jergens Company, but many others of the same general class. It also became engaged in the business of treating persons

for facial blemishes and deformities and for diseases of the skin. Wm. A. Woodbury and McCargo were employees and stockholders of the Institute, and had, possibly, acquired through John H. Woodbury, to whom certain rights were reassigned by the Institute, some interest in one or more of the commodities.

Such, in brief, were the conditions when, in 1901, the first contract, through which the complainant claims, was made. By that contract John H. and Wm. A. Woodbury, McCargo, and the Institute transferred and assigned unto the complainant "all their right, title, and interest in and to the commodities known as Facial Soap, Facial Cream, Dental Cream, Tooth Powder, Odorine Powder, Facial Powder, Shaving Sticks, and Shaving Soap, and all the trade-marks, copyrights, and privileges of every name and nature whatsoever appurtenant to the ownership thereof," absolutely; "also the privilege of using only on the articles above mentioned the neckless head trade-mark."

It is not denied that the complainant is still entitled to all the legal rights in and to the name and mark that were acquired by it through that contract, but it is contended by the Distributors that the rights so obtained by the complainant have not been enlarged or increased. The complainant, on the other hand, asserts that the remaining and complementary rights in the name and mark were acquired by it through the contract of March 6, 1909, and that thereby its rights in the name and mark became exclusive.

The circumstances leading up to the last-mentioned contract appear at large in the pleadings in the suit of Stiles, Trustee, against the Jergens Company. Complainant's Exhibit No. 73. Briefly stated, they are that by the contract of 1901 John H. Woodbury also transferred to the complainant herein 50 shares (being one-half) of the capital stock of the Institute. The remaining 50 shares were then owned by John H. Woodbury, 30 shares; Wm. A. Woodbury, 19 shares; and McCargo, 1 share—which had been given to him by Wm. A. Woodbury. After the last-mentioned contract was made, the directorate of the Institute consisted of a representative of the Jergens Company, McCargo, and Wm. A. Woodbury. The business of the Institute continued as theretofore, save as to the eight specified articles sold to the Jergens Company. In 1904 the complainant bought for a very large sum of money the 1 share of stock owned by McCargo, and he was replaced as director by another representative of the Jergens interests. Thereby the complainant acquired control of the board, and consequently of the Institute and its business.

On October 7, 1908, the Institute was adjudged a bankrupt upon a petition filed on the 4th day of the preceding month. The contract of March 6, 1909, through which complainant claims, was made by the trustee in bankruptcy. Through that contract the Jergens Company claims to have acquired all the rights in the mark and name not theretofore owned by it. The trustee in bankruptcy of the Institute thereby undertook to assign to one Leyman, who immediately made a like assignment to the complainant, all the right, title, and interest that the Institute had in the neckless head trade-mark at the time the petition

in bankruptcy was filed; in an application for a trade-mark, serial No. 37,232, filed by the Institute September 4, 1908 (being an application to register the word "Woodbury's" as a trade-mark for hair tonic, scalp cleaner, scalp cream, skin lotion, and massage cream), and—

"The exclusive right to manufacture and sell the proprietary toilet articles known as 'Woodbury's Hair Tonic,' 'Woodbury's Massage Cream,' 'Woodbury's Scalp Cleaner,' 'Woodbury's Clear Skin Lotion,' 'Woodbury's Clear Skin Cream,' 'Woodbury's Scalp Cream,' and to use thereon the so-called 'neckless head' trade-mark, being a mark similar to that registered as United States trademark No. 16,958."

The Distributors contends that the trustee had no title to or interest in the rights he thereby undertook to transfer, and that consequently the complainant took nothing under that assignment. This contention of the Distributors is founded upon an agreement, dated November 10, 1905, between the Institute, of the one part, and the Woodbury Company, a New York corporation, of the other part, whereby the Institute assigned, as the Distributors contends, to the Woodbury Company, absolutely, all the rights that the trustee in bankruptcy of the Institute subsequently attempted to sell and transfer to the complainant through Leyman as hereinbefore pointed out. This agreement of 1905 recites the ownership by the Institute of the neckless head trademark and of lists of patients and other persons applying to it for treatment in medical, surgical, and hygienic branches, and lists of names of persons who had applied or were likely to apply to the Institute for such treatment; that the Woodbury Company was desirous of acquiring the exclusive license to use the trade-mark, except in so far as conflicting licenses had been granted to other persons or corporations, "allowing the Institute, however, to reserve to itself the right to use the same so long as the Institute shall continue in active business, but not otherwise"; that the Woodbury Company was desirous of acquiring the lists of patients and mailing lists, and any and all additional or supplementary lists of patients and mailing lists' that might be acquired by the Institute, "the same to be the exclusive property of the company if the Institute ever ceases to engage in active business"; and that the Woodbury Company was willing in consideration thereof to issue to the Institute its entire capital stock. The agreement then provides:

"* * * That the Institute, for and in consideration of the issuance and delivery to it of 100 full-paid and nonassessable shares of the capital stock of the company at par, being the entire capital stock thereof, shall and hereby does give and grant to the company the exclusive license to use the aforesaid neckless head trade-mark, which was registered by the Institute on the 3d day of June, 1889, except in so far as conflicting rights have heretofore been given or granted to other persons or corporations, reserving to itself, however, the right to use the same so long as it shall continue in active business, but not otherwise; and the Institute for the consideration aforesaid hereby agrees to forthwith deliver to the company true and accurate copies of any and all lists of patients and mailing lists described above which are now in possession of the Institute, and hereby agrees to supply the company every 30 days with any and all additional and supplemental lists of patients and mailing lists that may be acquired by the Institute in its business; * * * and the Institute, for the consideration aforesaid, further agrees with the company that, if at any time the Institute shall cease to engage in active

business, the right of the Institute to use said lists of patients and said mailing lists shall cease, and the same shall become the exclusive property of the company."

The making of the foregoing contract was duly authorized by both the Institute and the Woodbury Company. The evidence discloses that the Institute ceased to engage in active business on or before September 4, 1908. If the contention of the Distributors be correct the complainant acquired no additional rights through the trustee in bankruptcy of the Institute. It therefore becomes necessary to determine what rights, if any, were acquired by the Woodbury Company under the 1905 contract.

[1] The complainant urges that the contract under consideration transferred to the Woodbury Company only the right to use the neckless head in the treatment of blemishes, deformities, and diseases of the skin; that it did not convey to the Woodbury Company any business or good will of the Institute, or any right to use the trade-name "Woodbury" in connection with the business of selling toilet articles; and that consequently the sale of the trade-mark was a sale in gross and void. The charter of the Institute conferred upon it only the power to manufacture and deal in chemical preparations and to print and sell books and pamphlets, yet, soon after its organization, it became engaged, not only in its authorized commercial business, but also in the business or profession of treating persons for facial blemishes and deformities and for diseases of the skin. By reason of its lack of charter power to engage in such professional business it anticipated an enforced cessation thereof, and in 1905 caused the Woodbury Company to be organized (minutes of January 12, 1905). The charter powers of that company were broad. They included not only the power to "conduct and maintain sanatoriums and other places for the reception and care of patients, and for medical and hygienic treatment of the ailments, diseases, and deformities of such patients, and to employ physicians and surgeons to administer medical, surgical, and hygienic treatment, and to demonstrate and use any and all of the articles hereinbefore mentioned and described," but also the power, mentioned earlier in the charter, to manufacture and deal in soaps, hair tonics, and all other toilet preparations and accessories, proprietary articles of all kinds, drugs, chemicals, and toilet articles.

The offer of the Institute, expressly authorized by its board of directors, to the Woodbury Company for the entire capital stock of the latter company, stated that in consideration of that capital stock it would give to the Woodbury Company "the exclusive right to use *in its business* * * * the neckless head trade-mark, * * *" subject to certain exceptions not here material. That offer was accepted by the Woodbury Company. The authorized business of the latter company was not restricted to the treatment of persons. It included the power to manufacture and sell toilet articles and preparations as well. The contract gives to the Woodbury Company "the exclusive license to use the aforesaid neckless head trade-mark," subject to the specified reservation and exception. The use granted to the Woodbury Company is general, and is not restricted to any particular part

of the business of that company. The exceptions to the grant of the exclusive right to the Woodbury Company are:

(1) "Except in so far as conflicting rights have heretofore been given or granted to other persons or corporations;" and (2) "the right [of the Institute] to use the same so long as it shall continue in active business but not otherwise."

The only rights in the trade-mark theretofore granted by the Institute, so far as appears from the evidence, were the rights conferred upon the plaintiff by the contract of 1901. The rights granted by the contract of 1901 were for the use of the mark upon vendible commodities only, and were in no sense for the use of the mark in connection with professional treatment of persons. If the intent of the parties to the 1905 contract was that the grant of the mark to the Woodbury Company was for the use thereof in connection with professional treatment only the rights to the mark theretofore granted were in no sense "conflicting" and the first exception to the grant in the 1905 contract was meaningless.

[2] Such a construction should be avoided. The second exception is a reservation to the Institute of a right to use the mark for a specified period, and the contract expressly takes away from the Institute and confers upon the Woodbury Company, subject only to the first exception, all rights in the mark after it (the Institute) shall have ceased active business, thereby indicating that the grant to the Woodbury Company was general, and embraced all rights of the Institute in the mark, including use upon its vendible commodities. In paragraph IV of an answer to a bill of complaint of the trustee in bankruptcy of the Institute filed against the complainant herein and others for alleged fraud in connection with the bankruptcy of the Institute the Jergens Company admitted that prior to 1901 the Institute manufactured or caused to be manufactured and sold various toilet preparations; that from June 13, 1901, to January 1, 1908, the Institute continued to manufacture or have manufactured, sell, or advertise to a very small extent toilet and medicated toilet preparations, but the manufacturing, sale, and advertising thereof were until February 28, 1908, "solely incidental to and in connection with the conduct by said Institute of its business * * * of treating persons for facial blemishes and deformities and for diseases of the skin." I find nothing to indicate that it was the purpose of the Institute to dispose of its main business and to retain the business "solely incidental" thereto. For the foregoing reasons I am of the opinion that in the contract of 1905 the grant of the trade-mark rights included the right to use the mark upon vendible commodities.

[3] It also appears from the foregoing that the "patients" of the Institute were both patients and customers. Consequently the grant of the trade-mark was not unaccompanied by a grant of good will for the Woodbury Company also bought from the Institute "all lists of patients" (customers)—a proper means of effecting the sale of a business or good will. Nims on Unfair Competition and Trade-Marks, pp. 34, 35, 318. Hence the sale of the trade-mark was not a sale in gross or void.

[4] The complainant further urges that, if the contract was·not void, it constituted but a mere license, personal to the Woodbury Company, to use the mark. I cannot agree with this contention, for I think the agreement discloses a purpose to transfer, and that it did transfer to the Woodbury Company, all rights in the trade-mark, subject only to the two exceptions, and that, although using the word "license," it was, in legal contemplation, an assignment. Sirocco Engineering Co. v. Monarch Ventilator Co. (C. C.) 184 Fed. 84; Griggs Cooper & Co. v. Erie Preserving Co. (C. C.) 131 Fed. 359.

[5] The trade-mark assigned was the common-law trade-mark of the Institute as used on its various products, identified in the contract by reference to the Patent Office certificate of registration as applied to facial soap. As the neckless head was accompanied in the trade-mark by the name "John H. Woodbury," as hereinbefore shown, the trade-mark assigned included the name "John H. Woodbury" and the word "Woodbury's," by which abbreviated name the commodities in connection with which the trade-mark was used had become known to the purchasing public. It should also be noted that the corporate name of the assignee is "the Woodbury Company." I think the contract of 1905 conferred upon the latter company, after the Institute ceased active business, all rights to use the trade-name "Woodbury" that the Institute had theretofore enjoyed, save only such limited rights as were granted by it to the complainant in 1901.

[6, 7] The complainant contends, however, that such rights as the Woodbury Company may have had were abandoned by nonuser. But abandonment is a matter of intention. Baglin v. Cusenier Co., 221 U. S. 580, 597, 598, 31 Sup. Ct. 669, 55 L. Ed. 863. I find nothing in the evidence to indicate any intention on the part of the Woodbury Company to abandon its rights so acquired, but, on the contrary, it seems to have been the purpose of both the Woodbury Company and the Institute, then its sole stockholder, to retain the Woodbury Company with all its rights as a fortified base to which those interested in the Institute could retreat in the event the Institute should meet with disaster by reason of its exercise of rights not conferred upon it. The idea of abandonment is wholly inconsistent with the very purpose for which the Woodbury Company was organized and the contract of 1905 made. It follows that the assignment of March 6, 1909,, from the trustee in bankruptcy of the Institute to the complainant was without effect and that the complainant acquired no rights thereunder.

The complainant offers other evidence intended to defeat the effect of the contract of 1905. This evidence consists of an alleged contract of April 26, 1909, purporting to have been made between the complainant and the Woodbury Company, whereby, it is contended by the complainant, the contract of 1905 was abrogated and novated. The instrument alleged to have this effect recites that—

"The Andrew Jergens Company is the owner of the exclusive right to manufacture and sell and the good will of the business of manufacturing and selling the proprietary toilet articles known as 'Woodbury's Hair Tonic,' 'Woodbury's Scalp Cream,' 'Woodbury's Scalp Cleaner,' and 'Woodbury's Clear Skin Lotion,' and to use thereon United States trade-mark No. 16,958, registered August 20, 1889, and the name 'Woodbury's,' as set forth in applica-

tion for United States trade-mark, serial No. 37,232, filed September 4, 1908, and is the owner of various common-law trade-marks and trade-names for the use on said articles for the registration of which it is about to apply to the Commissioner of Patents of the United States," and that the "Woodbury Company is desirous of acquiring the exclusive right and license to manufacture and sell and to use the good will of the business of manufacturing and selling said proprietary toilet articles and of using thereon said trade-marks and trade-names registered and to be registered."

The instrument then provides:

"That the Andrew Jergens Company, for and in consideration of the sum of $1 and other valuable considerations to it in hand paid by the Woodbury Company, and in consideration of the payments to be hereafter made as set forth herein, has given and granted unto said the Woodbury Company, and by these presents does herewith give and grant unto said the Woodbury Company, the exclusive right and license to manufacture and sell, and to use the good will of the business of manufacturing and selling the proprietary toilet articles known as 'Woodbury's Hair Tonic,' 'Woodbury's Scalp Cream,' 'Woodbury's Scalp Cleaner,' and 'Woodbury's Clear Skin Lotion,' and the exclusive right and license to use thereon United States trade-mark No. 16,958, and the common-law trade-mark similar thereto now and heretofore used thereon; the exclusive right and license to use thereon the trade-mark set forth and described in application for United States trade mark, serial No. 37,232, and the exclusive right and license to use thereon all common-law trade-marks, trade-names, and trade labels heretofore and now used thereon."

It provides for royalties to be paid by the Woodbury Company equal to 10 per cent. upon the net sales of said preparations, but the amounts to be so paid were to be not less than $3,000 a year for the first two years and $4,500 a year thereafter. It also contains these provisions:

"The Woodbury Company hereby stipulates and agrees that the Andrew Jergens Company is the sole and exclusive owner of the right to manufacture and sell and of the good will of the business of manufacturing and selling said toilet articles, and the sole and exclusive owner of said trade-marks, trade-names and trade labels, and that the same are valid and subsisting trade-marks, trade-names, and trade labels, and that the Woodbury Company will not use the same upon any articles except those enumerated herein, or in any business except the manufacture and sale of the articles enumerated herein. * * *

"It is mutually covenanted and agreed, * * * if any payment herein stipulated to be paid is not paid when due, or if the Woodbury Company shall violate any covenant of this agreement, * * * then this agreement and all rights hereunder shall terminate and be at an end, as fully as if this agreement had not been made, and all rights and licenses hereunder shall revert to said the Andrew Jergens Company; otherwise, this agreement shall remain in force for 50 years.

"It is covenanted and agreed between the Andrew Jergens Company and the Woodbury Company that this license is personal to the Woodbury Company and shall not inure to its successors or assigns."

[8] Is the alleged agreement of April 26, 1909, a valid and binding agreement? It must be so found; otherwise, the contention of the complainant that thereby the contract of 1905 was abrogated and novated cannot be sustained. To be valid and binding it must be supported by a consideration, and it must also be the act of the Woodbury Company. Before and at the time of making the purported agreement of April 26, 1909, the last-named company was the owner of the trade-mark, trade-name and good will of the defunct Institute, save only such rights therein and thereto as had been acquired by the complainant under the 1901

273 F.—61

contract. If complainant's contention be sound, the Woodbury Company, owning all the rights it had acquired under the 1905 contract, paid to the complainant, which had none of those rights, a substantial sum to have the latter assign to it (the Woodbury Company), for a limited term and under heavy royalty, something which the complainant did not have, but which the Woodbury Company did have. The purported contract of April 26, 1909, expresses the consideration therefor. As expressed, that consideration passes from the Woodbury Company to the complainant, and not from the complainant to the Woodbury Company, as would be expected if the Woodbury Company were in effect granting rights to the complainant. A consideration moving from the Woodbury Company to the complainant will not support a grant or surrender of the rights of the Woodbury Company.

[9, 10] Again, if the contention of the complainant be correct, the instrument of April 26, 1909, completely divested the Woodbury Company of its entire assets. Such a contract is, in the absence of corporate authorization or ratification, beyond the power of the president of a corporation to make. De la Vergne Co. v. German Savings Inst., 175 U. S. 40, 53, 20 Sup. Ct. 20, 44 L. Ed. 65. No antecedent corporate authority therefor has been shown. Nor was there subsequent corporate ratification or acquiescence, for the complainant herein as early as December, 1910, admitted (in paragraph VIII of its answer to the bill of complaint of the trustee in bankruptcy of the Institute against the complainant herein and others) that the Woodbury Company had, since the bankruptcy of the Institute, claimed to be the owner of the trademarks, mailing and patients' lists by virtue of the 1905 agreement. In January, 1911, the Woodbury Company in its answer filed to the same bill of complaint expressly stated that it so claimed. Soon thereafter the Woodbury Company repudiated its alleged contract of April 26, 1909, with the complainant and that repudiation was acquiesced in by the Jergens Company.

[11, 12] At the time the last-mentioned contract was made, the complainant owned all the capital stock of the Woodbury Company and the complainant advances the thought that such ownership was equivalent to and of the same effect as antecedent corporate authority. I cannot subscribe to this contention. De la Vergne Co. v. German Savings Inst., 175 U. S. 40, 53, 20 Sup. Ct. 20, 44 L. Ed. 65; Machen on Corp. § 1290. Nor do I find that by reason of the unauthorized, unratified, and repudiated act of its president in executing the contract of April 26, 1909, the Woodbury Company is estopped from asserting its rights under the 1905 contract. After April 26, 1909, the Jergens Company transferred the entire capital stock of the Woodbury Company to the president of the latter company as compensation for services theretofore rendered by him to the complainant, and it seeks to use this transfer as a consideration for the contract of April 26, 1909. The alleged contract, however, states another consideration and the expression of the one impliedly excludes the other.

[13] Furthermore, the transfer of the shares by the complainant to Buggeln, the president of the Woodbury Company, was as compensa-

tion for services rendered to the complainant by him in an individual and personal capacity. The transfer of the shares to Buggeln was res inter alios acta, and in no way affected the rights of the Woodbury Company. It follows, in my opinion, that the instrument of April 26, 1909, did not by estoppel or otherwise affect the rights of the Woodbury Company, acquired by it through the contract of 1905.

The complainant advances still another ground upon which it contends the defendants may not successfully dispute its claims to the exclusive use of the mark and name. This contention is that by reason of certain acts and statements of Wm. A. Woodbury the Distributors is estopped from denying that the rights of the complainant are exclusive. This contention makes necessary an inquiry into the alleged authority of the Distributors to use the name and mark and into the relation of Wm. A. Woodbury to its business. The Distributors seeks to justify its acts by authority and rights derived, as it asserts, through a contract of 1918, from two separate and distinct sources, namely, from the Woodbury Company and from the individual Wm. A. Woodbury. Wm. A. Woodbury, a cousin of John H. Woodbury, became in the year 1892 an employee of the Institute and then or subsequently a stockholder and an officer thereof. His duties seem to have been those of a general manager with more or less supervision over all the departments of the Institute, but in charge particularly of its advertising.

The evidence discloses that after the bankruptcy of the Institute he directed his attention to an intelligent and comprehensive study of all phases of the business in which the Institute had theretofore been engaged. He made extensive investigations of the literature pertaining to the care of the person, directed mainly to the care of the complexion, hair, hands, and feet. His investigations revealed that comparatively little intelligent consideration had been given to these subjects, and that the literature was mostly confined to the exploitation of particular commodities or preparations. Accordingly Wm. A. Woodbury, utilizing the information acquired by him through his employment with the Institute and through his own subsequent research, prepared a series of lessons severally directed to a particular branch of the art of the care of the person. These lessons were distributed by him in the form of a correspondence course to those engaged in the art professionally, such as manicure shops, beauty parlors, and the like, as well as to individuals not so engaged, but interested in such matters. Subsequently he published a series of books, each dealing with some particular phase of the general subject. Ultimately one complete book, embodying all phases of the general subject-matter, was written and caused to be published by him. He also wrote many articles for newspaper syndicates. As one skilled in the care of the person he acquired an extensive reputation.

Originally it was the purpose of Wm. A. Woodbury not to engage in the manufacture and sale of toilet articles, but his several publications brought to him numerous requests for preparations to be used in the care of the person. Consequently he began furnishing to such inquirers preparations put up by himself, and he continued so to do until he

made his arrangement with the Distributors. Included among his preparations were soaps, creams, powders, and similar articles. The rights which the Woodbury Company undertook to confer upon the Distributors, and which the latter now claims consist of the selling agency for all the products which the Woodbury Company had the right to manufacture under the contract of 1905, the right to use thereon the neckless head trade-mark, including the name "John H. Woodbury" and the name "Woodbury." The rights that Wm. A. Woodbury undertook to confer upon the Distributors, and which the latter now claims, consist of the right to use the name "Wm. A. Woodbury" as part of its corporate name, the right to use that name on toilet preparations sold by it, the right to avail itself of the knowledge of Wm. A. Woodbury, acquired in the business of the Institute from 1892 to 1908, the right to utilize the name "Wm. A. Woodbury" and his reputation, acquired by and resulting from his widely distributed publications during the period of approximately 10 years beginning about 1909, and the right to utilize the good will and business of Wm. A. Woodbury in the sale of toilet preparations marketed by him during the same period.

[14] The contention of the complainant that the Distributors, in so far as it claims through the Woodbury Company, is estopped from asserting that the Woodbury Company is possessed of any rights under the 1905 contract, by reason of certain acts and statements of Wm. A. Woodbury, is based upon affidavits and pleadings of Wm. A. Woodbury of an alleged contrary tenor, filed by him or on his behalf in the bankruptcy proceedings of the Institute, and in a suit brought by the trustee in bankruptcy of the Institute against the complainant herein. In that suit the Jergens Company was charged by the trustee with fraudulently bringing about the bankruptcy of the Institute, to its detriment, and particularly to the damage of its minority stockholders. It, of course, needs no argument to show that the acts and statements of Wm. A. Woodbury, made after the Woodbury Company had acquired its rights under the contract of 1905, can in no way affect the rights of the Distributors, in so far as it claims through the Woodbury Company.

[15] Is the Distributors estopped by the acts and statements of Wm. A. Woodbury from denying that the complainant has the rights which it (the Distributors) claims through him? Whatever position may have been taken by Wm. A. Woodbury in the bankruptcy proceedings and in the suit of the trustee in bankruptcy against the Jergens Company, the questions there involved are not the questions presented here. In those proceedings Wm. A. Woodbury was attempting to protect his rights as a minority stockholder of the Institute as against the Jergens Company. The rights of Wm. A. Woodbury properly to use his own name and fame in the business of manufacturing and selling toilet articles were not there involved. The rights which in this suit the Distributors claims through Wm. A. Woodbury are rights derived from him individually; they are personal rights, as distinguished from the rights of a stockholder. The rule that a party will not be allowed in a subsequent judicial proceeding to take a position inconsistent with a position taken by him in a former judicial proceeding does not

apply to suits in which the issues and the parties are not the same. 10 R. C. L. 702.

[16] If, however, the estoppel of the Distributors, as set up by the complainant, does not depend upon the rule touching inconsistent positions in judicial proceedings, but upon estoppel in pais, it is met by the insuperable difficulty that the alleged misrepresentations of Wm. A. Woodbury must consist of facts, not of "opinion, or a conclusion of law from a comparison of facts" (Bigelow on Estoppel, 634, 635), and of the further difficulty that a party setting up an estoppel must have been ignorant of the real facts as to the matter in controversy (Bigelow on Estoppel, 681). The complainant has not shown, and is not in a position to show, that it was ignorant of any fact as to which statements were made by Wm. A. Woodbury in the bankruptcy proceedings. I think, therefore, that the Distributors is not estopped by any act or statement of Wm. A. Woodbury from denying that the complainant has the rights which it asserts.

[17] The complainant caused a combination mark, consisting of the word "Woodbury's" and the neckless head, to be registered for use upon some of the commodities which it claims through the assignment of the trustee dated March 6, 1909; but under the facts of this case such registration neither conferred any greater rights in the use of that name or mark upon the complainant, nor diminished the rights of others entitled to the use thereof. Thomas G. Carroll & Son Co. v. McIlvaine & Baldwin (C. C.) 171 Fed. 125, affirmed 183 Fed. 22, 105 C. C. A. 314; Sarrazin v. W. R. Irby Cigar & Tobacco Co., 93 Fed. 624, 35 C. C. A 496, 46 L. R. A. 541; Scandanavia Belting Co. v. Asbestos & Rubber Works, 257 Fed. 937, 169 C. C. A. 87.

In view of the foregoing conclusions I am of the opinion that the rights and the only rights that the complainant has in the neckless head trade-mark and in the name "Woodbury" are those acquired by it through the contract of June 13, 1901. Its rights to the use of the neckless head trade-mark are expressly limited by that contract to the eight articles specifically mentioned therein. Its rights under that contract to the use of the name "Woodbury" have been determined by the Court of Appeals of the state of New York, the state in which the contract was made, in a suit of the complainant against John H. Woodbury. The rights of Wm. A. Woodbury to use his own name were not any more surrendered by the contract of 1901 than were the rights of John H. Woodbury to use his name, both of whom were parties thereto. The Court of Appeals in that case (197 N. Y. 66, 90 N. E. 344) said:

"The contract which is the basis of the plaintiff's right to use the name 'Woodbury' entitled them to use that name only when applied to the several commodities expressly specified therein. It leaves the defendants entitled to use that name as applied to any other articles which they manufacture and sell, except such as so resemble the articles specified in the contract that they are calculated to deceive and mislead the public to believe that they are identical with those named in the contract. The trial court has found that the article manufactured and sold by the defendants as 'Woodbury's New Skin Soap' is thus calculated to deceive and mislead the public. That finding has been unanimously affirmed by the Appellate Division, and hence is conclusive upon

this court. It follows that the injunction embodied in the judgment is right, so far as it is effectual to restrain the defendants from using the name 'Woodbury' in connection with any of the articles specified in the contract and also so far as it restrains them from making and selling 'Woodbury's New Skin Soap.' It goes too far, however, in forbidding the defendants from using the name 'Woodbury' on other soaps or in connection with other articles where such use is not deceptive or misleading."

Having ascertained the rights of the complainant in the name and mark there remains to be determined only whether those rights have been infringed by the defendants or any of them. This issue depends upon the acts and doings of the several defendants as disclosed by the evidence. The complainant admits that there is no evidence sustaining its charges of infringement against Woodbury System, Inc., and that as to it the bill should be dismissed.

[18] There is no evidence showing that Woodbury, Inc., has infringed any rights of the complainant (however broad those rights may be), but complainant contends that it has threatened to infringe and bases this contention upon an advertisement of and a circular issued by one Walter J. Pierce & Co. It is unnecessary to determine whether or not the circular or advertisement, if authorized by Woodbury, Inc., would constitute a threat to infringe, for I am unable to conclude from the evidence that the advertisement or circular were in any sense sanctioned by that defendant. The bill as to it should be dismissed, without regard to the limited scope of complainant's rights in the name and mark.

[19] The Distributors has been actively engaged in business. It sold under its own name, "Wm. A. Woodbury Distributors, Inc.," or under the name "Wm. A. Woodbury," some articles by virtue of the rights which it acquired from Wm. A. Woodbury. The Distributors has not used upon such articles the neckless head trade-mark. When selling articles acquired from the Woodbury Company, and other articles not of the species of any of the eight articles upon which the complainant has the exclusive right to use the neckless head, the Distributors has used thereon the neckless head trade-mark. As an illustration of the articles upon which the neckless head has been so used by the Distributors, there are found among the exhibits such articles as Clear Skin Lotion, Face and Hand Lotion, Acne Pimples Soothing Lotion, Hair Tonic, Liquid Shampoo, Mouth Elixir, Coarse Pore Lotion, Cleansing Massage Cream, Cold Cream, Heal Skin Ointment, and Complexion Tablets. As an illustration of the articles upon which the neckless head has not been used by the Distributors, there are found among the exhibits such articles as Wm. A. Woodbury Kleen Odor Soap, Wm. A. Woodbury Sea Maid Soap, Wm. A. Woodbury Olive and Palm Soap, Wm. A. Woodbury Dentate, and Mercuric Iodide Soap.

[20] It cannot be denied that the evidence discloses that some confusion exists in the public mind as to the origin of the articles of the respective parties, yet, so far as I have been able to discover from the evidence, such confusion as does exist arises from the exercise of the legal rights of the respective parties, and not from any wrongful act of

the Distributors. Such confusion seems wholly attributable to the fact that two separate and distinct corporations, deriving their title from a common source, have the right to use the same mark and name upon different articles and preparations of the same general class, and to the further fact that an individual has, subject to certain conditions (observed, I think, by the Distributors), the right to use his name in his business, although his surname may have acquired a secondary meaning, and to transfer that business to a corporation bearing his name. Howe Scales Co. v. Wyckoff, Seamans, etc., 198 U. S. 118, 25 Sup. Ct. 609, 49 L. Ed. 972; Waterman Co. v. Modern Pen Co., 235 U. S. 88, 35 Sup. Ct. 91, 59 L. Ed. 142.

[21] What constitutes an infringement of plaintiff's rights under the contract of 1901 was decided in Andrew Jergens Co. v. Woodbury, supra. The test for infringement in this suit is the test in that case. Measuring the acts of the Distributors by the rule of that case, I find no infringement committed by it in putting out its articles or in the manner in which such articles are put out. The dress of the articles sold by the Distributors is in no sense a simulation of the dress of the complainant's goods. The articles sold by it do not, in my opinion, "so resemble the articles specified in the contract (of 1901) that they are calculated to deceive and mislead the public to believe that they are *identical* with those named in the contract" of 1901. The mark and name as used by the Distributors are used by it in the exercise of its legal rights. Those rights it has not abused.

While I have given this limited detailed consideration to the question of infringement of complainant's rights by the Distributors, I do not understand the complainant to contend that the defendants or any of them have violated or threatened to violate any rights which the Jergens Company claims under the 1901 contract, its charges of infringement having been predicated mainly, if not entirely, upon the hypothesis that it has the sole and exclusive right to use the neckless head trade-mark and the name "Woodbury" upon toilet articles and dermatological preparations.

In view of the foregoing conclusions and without considering the defense of unclean hands, I am of the opinion that the bill should likewise be dismissed as to the Distributors.

A decree in accordance with this opinion may be submitted.